IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Kara Mitchell, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 21 C 6876 |
| | ) | |
| | ) | |
| ExxonMobile Corp., | ) | |
| | ) | |
| Defendant. | ) | |

<u>Memorandum Opinion and Order</u>

The complaint in this case alleges that plaintiff Kara
Mitchell was unlawfully terminated from her job as a laboratory
technician at defendant ExxonMobil's fuel and lubricants plant in
Cicero, Illinois. Mitchell claims that she was terminated based on
her gender in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq. Defendant moves for summary
judgment, arguing that plaintiff has neither carried her burden
under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S.
792 (1973), nor otherwise shown that a reasonable jury could
conclude that she was terminated based on her sex. For the reasons
explained below, I agree and grant defendant's motion.

I.

The following facts are undisputed except where noted. Plaintiff began working at defendant's Cicero plant in March of 2016. At that time, she was an employee of a company called Aerotek, which provided contractor services to ExxonMobil. In or around April of 2019, ExxonMobil employee Jeffrey Hayes suggested that plaintiff apply for a full-time position as a laboratory technician with ExxonMobil. Defendant hired plaintiff for that position on April 22, 2019, and she remained at the Cicero plant until her termination on August 28, 2020. During her employment, Hayes was plaintiff's direct supervisor, although he worked at defendant's Paulsboro, New Jersey location, not at the Cicero plant. Hayes also supervised two other laboratory technicians at the Cicero plant, Dan Pitts and Victor Aguirre.

Each year, every ExxonMobil employee participates in defendant's annual employee performance evaluation.[1] The multi-step assessment process, which runs from April of each year to March of the following year, begins with each employee completing a self-assessment describing his or her accomplishments, strengths, and development opportunities. Managers then collaborate to assess each employee based on the employee's

---

[1] Contractors who provide services for ExxonMobil but are employed by other companies such as Aerotek do not participate in these annual evaluations.

2

relative performance as compared to other employees in an assigned "Assessment Group." Def.'s L.R. 56.1 Stmt., ECF 40, at ¶¶ 18-19. Assessment Groups comprise employees with similar job classifications in similar roles across the organization, and they are not limited to employees with the same job title, who work in the same location, or who report to the same supervisor. *Id*. at ¶ 21.

Plaintiff's only annual assessment at ExxonMobil covered her performance from April of 2019 through March of 2020. As a laboratory technician, plaintiff was in a category of employees known as Operations, Clerical and Administrative ("OCA") employees. And as an experienced hire, for assessment purposes she fell within the "Management Assigned Category" ("MAC") of employees. OCA employees are assessed using letter grades, with A being the highest grade and D being the lowest. When an OCA employee is assessed as a D relative to his or her peers, the employee is placed into the Company's Management of Lower Relative Performance ("MLRP") program. *Id*. at ¶ 26. Under this program, employees generally have the option either: a) to continue working under a performance improvement plan ("PIP"); or b) to resign on a specified date in exchange for signing a separation agreement and release of claims, and to stop working actively while continuing to receive their base salary and outplacement services in the meantime. *Id*. at ¶ 27. But at the time of plaintiff's

3

assessment, the PIP option was not available to MAC employees. These employees' only options were to resign under the conditions described above or to be terminated without the benefits and constraints of those conditions.

Jeffrey Hayes was the manager responsible for reviewing plaintiff's self-assessment and the information that plaintiff's peers provided about her performance through "Knowledgeable Others Feedback" forms. *Id.* at ¶ 25; Pl.'s L.R. 56.1 Stmt., ECF 48 at ¶ 6. Plaintiff met with Hayes to discuss her preliminary assessment in or around April of 2020. She recalls that at this meeting, Hayes told her that she would receive a B, and indeed, on June 9, 2020, Hayes submitted preliminary performance assessment categories to human resources for his direct reports, i.e., plaintiff, Pitts, and Aguirre, proposing that each be assessed as a B. Hayes 06/09/20 email, ECF 40-16.

On June 15, 2020, Hayes's direct supervisor, Hank Muller, who was the "Cluster Manager" for the North Central Cluster of facilities that included the Cicero plant,[2] sent an email to Hayes and other supervisors in the Cluster stating, "[w]e need to align on the preliminary performance categories for our OCAs…. Our distribution requires 2 A and 2 C, so if we change any of those we

---

[2] The Cluster also included facilities in Paulsboro, New Jersey, Portland, Oregon, and Edmonton, Canada. Def.'s L.R 56.1 Stmt., ECF 40, at ¶ 38, n.4.

4

need to change someone to make that distribution." Muller 06/15/20 email, ECF 40-3. The email also contained a distribution chart requiring the following distribution of performance categories:

    A - Outstanding Contributor   20%-30%

    B - Strong Contributor        40%-50%

    C - Contributor               20%-30%

    D - Needs Improvement         8%-10%

*Id*. The email suggested that plaintiff receive a B and that Pitts receive a C.

Thereafter, however, Hayes told Raul Sanchez, the Cicero plant manager, that he and Muller "had a discussion" about "having to select one [of the Cicero lab technicians] as a 'D.'" Hayes 06/16/20 email, ECF 40-18. Hayes explained that Aguirre should remain a B due to his "involvement with Portland and OIMS responsibilities." Hayes went on to say, "our issue, which will impact lab operation," is that Pitts and plaintiff would then receive a C and a D, and that based on the one page summaries attached to the email, which laid out each of these employees' contributions, strengths, and areas for development, "I would place Dan as the C, and unfortunately Kara MAC'd at the D if need be. Please review and confirm or realign my thinking." *Id*.

Then, on June 17, 2020, Hayes met with other managers to assess plaintiff's performance relative to others in her Assessment Group: Gilmore Kwon (male), Louis Palombo (male), and Terry Davis (female). Def.'s L.R. 56.1 Stmt., ECF 40, at ¶ 33, 41. Like plaintiff, each of these employees was in the MAC category, as each was new hire with three or more years of relevant experience. At the end of this relative performance assessment, Kwon, Palombo, and Davis each received a final grade of B, while plaintiff received a D.

Because plaintiff was assessed as a D, she was placed in the company's MLRP program. In August of 2020, Sanchez met with plaintiff to communicate the results of her assessment. Sanchez discussed the competitive nature of plaintiff's Assessment Group and explained that her lack of "stand outs" as compared to her peers drove her final grade of D. Consistent with her status a MAC employee, plaintiff was not offered the opportunity to continue working under a PIP. Her only options were to resign with a separation agreement that included certain benefits in exchange for a release of claims or to be terminated. Plaintiff chose the latter. This lawsuit followed.

## II.

In considering a summary judgment motion in a Title VII discrimination case, the "singular question" I must decide is whether plaintiff has introduced evidence that would permit a

reasonable factfinder to conclude that defendant discharged her because of her sex. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (citation omitted). One way she can do this is by invoking the burden-shifting framework of *McDonnell Douglas*, which requires her to make a *prima facie* case of discrimination by showing that: (1) she belongs to a protected class; (2) she met defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of plaintiff's protected class received better treatment than she did. If she does this, the burden shifts to defendant to offer a nondiscriminatory motive for her termination, and plaintiff must then show that defendant's proffered reason was pretextual. *Id*. at 956-57. But plaintiff need not use the *McDonell Douglas* framework. What matters is whether she has presented "enough evidence to allow the jury to find in [her] favor." *Igasaki*, 988 F.3d at 957-58.

The first and third elements of the *McDonnell Douglas* framework are not in dispute. Plaintiff argues that she satisfies the second element—that she was meeting defendant's legitimate expectations—stating that she never received a negative performance evaluation, nor is there evidence that her work was ever criticized prior to the employee assessment at issue. But plaintiff acknowledges that defendants' competitive assessment process contemplates that MAC employees whose performance compares

7

unfavorably to that of their peers may be terminated, regardless of whether the employee's work was previously deemed lacking. Indeed, defendant has never asserted that plaintiff was terminated because her performance was inadequate by any measure other than by comparison to the other employees in her Assessment Group. In this context, the absence of negative evaluations preceding plaintiff's annual assessment is not evidence that she was meeting defendant's legitimate expectations.

The parties also dispute whether plaintiff's evidence supports the inference that she was treated worse than similarly situated male employees. Plaintiff proposes Pitts and Aguirre, the other Cicero laboratory technicians, as comparators. But she admits that neither Pitts nor Aguirre was in her Assessment Group, so her performance was not compared to theirs during the assessment. Instead, Pitts and Aguirre were each compared with other employees in their respective Assessment Groups. But if the record contains any evidence of these comparisons or how Pitts or Aguirre fared in them, plaintiff has not cited it.[3] Accordingly, even assuming that Pitts and Aguirre are proper comparators,

---

[3] Plaintiff complains that defendant did not preserve her comparators' "Knowledgeable Others Feedback" forms. But what is relevant is how Pitts and Aguirre ultimately fared in their relative performance assessment, and the content of those forms is merely one element that their respective managers would have considered in that connection. The relevance of these documents, if any, is thus remote.

plaintiff offers no evidence from which to draw the comparison that is relevant in the specific context of this case. That is, she cannot show that Pitts and Aguirre were assessed unfavorably as compared to others in their Assessment Groups but did not receive lower grades than their Assessment Group peers and were not placed in the MLRP program.

Without any evidence of how Pitts or Aguirre stacked up against the employees to whom they were actually compared in the framework of defendant's annual employee performance evaluation, plaintiff's conclusion that she was treated less favorably than they were based on her sex amounts to mere speculation and does not entitle her to a trial. *See Igasaki*, 988 F.3d at 961 ("a speculative inference does not an employment discrimination case make."). For these reasons, plaintiff has not established a *prima facie* claim of discrimination.

Plaintiff fares no better if her evidence is viewed holistically, rather than through the lens of *McDonnell Douglas*. Plaintiff concedes that "no one perpetrator" discriminated against her. Opp., ECF 47 at 1. Her claim proceeds on the theory that defendant's "male management," as a whole, has "targeted female employees at Cicero," and that she was a victim of defendant's "pattern and practice of using the MLRP to force [female] employees out." *Id*. at 1, 2. This theory is problematic for several reasons.

First, to the extent plaintiff relies on the "pattern or practice" theory of Title VII liability, her evidence falls far short of what is required to satisfy her burden of proof. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (evidence must suggest "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts"; plaintiff must show that "discrimination was the company's standard operating procedure"); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012) ("[p]attern-or-practice claims require a showing that an employer regularly and purposefully discriminates against a protected group.") (internal quotation marks omitted); *E.E.O.C. v. Int'l Profit Assocs., Inc.*, No. 01 C 4427, 2007 WL 3120069, at *2 (N.D. Ill. Oct. 23, 2007) (plaintiff "can establish a *prima facie* pattern or practice of [sex] discrimination by proving that the employer regularly and systematically discriminated in its employment decisions."). Given the nature of what a plaintiff proceeding on a pattern-or-practice theory must prove, statistical evidence and analysis generally feature prominently in such cases. *See Koehler v. Infosys Techs. Ltd. Inc.*, 628 F. Supp. 3d 835, 848 (E.D. Wis. 2022) ("[t]he Seventh Circuit repeatedly has held that statistics play a significant role in proving a *prima facie* case of discrimination in a pattern-or-practice case") (citing cases). Yet plaintiff offers no evidence or analysis of this sort. Instead, her "pattern and practice" claim boils down to her assertion that

10

"several" women in various positions at the Cicero plant were "let go by Sanchez through the MLRP process." But she fails to place this sample in context or to provide any basis from which to infer that the circumstances she describes at this high level of generality represent the standard operating procedure of defendant's "male management."[4]

Second is a more salient problem: none of the evidence on which plaintiff relies to substantiate the "pattern and practice" she describes is admissible. Plaintiff points, for example, to deposition testimony taken in *Ontiveros v. ExxonMobil Fuel & Lubricants*, Case No. 21-cv-02335 (N.D. Ill.), including from witnesses who were not disclosed in this case. Plaintiff insists that I may consider the *Ontiveros* materials because they are "probative, relevant, and a matter of public record," and because defendants would not be prejudiced by their admission since the attorneys and defendant are the same in both cases. But the only authority plaintiff cites for this position is an unpublished decision on a motion *in limine* in a patent case, *Sioux Steel Co.*

---

[4] Among the undisputed facts that would presumably be relevant to a serious statistical analysis of how men and women fare under defendant's annual evaluation process and the MLRP program, but which plaintiff omits from her argument, are that Terry Davis, a woman in plaintiff's Assessment Group, received a final grade of "B," and that Jeffrey Hayes, a man, was assessed as "Needs Significant Improvement (the equivalent of a "D" for his employment category) and opted to retire after being placed in the MLRP program the same year as plaintiff. Def.'s L.R. 56.1 Stmt., ECF 40 at ¶¶ 43, 45.

*v. Prairie Land Millwright Servs.*, 16-cv-2212 (N.D. Ill. Nov. 18, 2022). Plaintiff vastly overreads this decision, however, in which the court merely declined to exclude evidence that had been produced in a prior litigation, which the court concluded was "admissible as a party admission under Federal Rule of Evidence 801(d)(2)" and might be relevant to certain issues to be tried in the pending case. The *Sioux Steel* decision does not remotely support what plaintiff proposes to do here: admit documents and testimony that defendant has had no opportunity to test in the context of this case.

At any rate, even the *Ontiveros* materials do not meaningfully advance plaintiff's cause. Almost all of the evidence plaintiff cites from that action focuses on Sanchez, and there is no evidence that Sanchez had any involvement in the decision to terminate plaintiff. Plaintiff makes much of Hayes's June 16, 2020, email to Sanchez, in which Hayes asked Sanchez to "confirm or realign [his] thinking" as to which laboratory technician should receive the D grade that Muller had evidently decided had to be given. *See* ECF 40-18. But there is no evidence that Sanchez responded to this email or otherwise weighed in on the question. At his deposition, Sanchez testified that he did not recall the issue Hayes flagged in this email; did not recognize or recall opening the email's attachments; did not participate in the assessment process for any OCA employees; and could not explain what Hayes meant by "confirm

12

or realign my thinking." Sanchez Dep., ECF 40-13 at 108:16-109:12. Plaintiff essentially suggests that Sanchez must be lying, but that inference is pure speculation that "alone cannot defeat a motion for summary judgment." *Igasaki*, 988 F.3d at 956 (quoting *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892-93 (7th Cir. 2003)).

It is true that the record raises questions that remain unanswered, particularly surrounding the issue of "having to select one [of the Cicero lab technicians] as a 'D.'" But the person seemingly best positioned to shed light on that issue, Jeffrey Hayes, apparently was not deposed. At the end of the day, what we are left with is evidence that at some point in defendant's complex employee evaluation process, defendant's management determined that one of the laboratory technicians at the Cicero plant had to receive a grade of D. After considering the "one pagers" summarizing each of these employees' respective contributions, strengths, and areas for development, Hayes told Sanchez that he believed that person should be plaintiff, a view that was evidently confirmed when Hayes met with the managers representing the other employees in plaintiff's Assessment Group. Because plaintiff was a MAC employee, a final grade of D spelled her certain separation from employment.

13

III.

Plaintiff was understandably blindsided by her termination. So far as the record reveals, she was never told that her performance was poor. To the contrary, as of her preliminary assessment meeting with Hayes, she was considered a "Strong Contributor," and she received feedback to that effect. Then suddenly, without further discussion or any opportunity to address any perceived shortcomings in her performance, plaintiff was confronted with two options: resign or be terminated.

One might reasonably find this sequence of events to be unfair, unduly harsh, or wrongheaded. But the fairness, decency, or wisdom of defendant's employee evaluation process or its decision to terminate plaintiff is not at issue. The only question is whether a reasonable factfinder applying the law could conclude based on the admissible evidence that plaintiff was terminated based on her sex. For the reasons explained above, I conclude that it could not. Accordingly, defendant's motion for summary judgment is granted.

ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge

Dated: September 13, 2024